IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO.: 3:23-CR-062-JAG

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| | ) | |
| NACHIKET BANWARI | ) | |
| | ) | |

The United States of America hereby submits this sentencing memorandum. For the reasons discussed herein, the Government recommends a sentence at the bottom end of the applicable Guideline range, or 41 months. The Government respectfully submits that the recommended sentence is sufficient, but not greater than necessary, to satisfy the goals of sentencing as set forth in Title 18, United States Code, Section 3553(a).

## I. PROCEDURAL HISTORY

On March 22, 2023, Defendant Nachiket Banwari was charged by Bill of Indictment with Conspiracy to Commit Mail and Wire Fraud (Count One) and Money Laundering Conspiracy (Count Two). Doc. 5. On June 4, 2025, Defendant pleaded guilty Count One, Mail and Wire Fraud Conspiracy, a violation of 18 U.S.C. § 1349.[1] In the plea agreement, the parties agreed: the base offense level is seven; a 16- or 18-level enhancement should be applied based on the loss amount; a two-level enhancement should be applied for 10 or more victims; a two-level enhancement should be applied for the scheme being conducted outside the United States; and a two-level reduction should be applied as a minor participant. Doc. 84. The United States further agreed to not recommend a sentence greater than 60 months and agreed to recommend a sentence at the bottom of the applicable Guideline range. *Id*.

[1] The Government will dismiss Count Two at sentencing.

On August 8, 2025, the United States Probation Office ("USPO") filed a draft presentence investigation report. Doc. 93. On August 22, 2025, Defendant filed objections to the Draft PSR. Doc. 94. Defendant's objections consisted of: (1) contesting the date on which Defendant knowingly joined the conspiracy for which he has pled guilty and (2) recommending a 16-level, not an 18-level, enhancement for a loss amount of between $1,500,000 and $3,500,000. *Id.* Defendant did not object to any of the communications or financial figures included in the Statement of Relevant Conduct. *Id.* On September 8, 2025, the USPO filed the final PSR. Doc. 95 (the "PSR").[2] The United States has no objections to the PSR.

As set forth in the PSR, § 2B1.1 provides for a base offense level of seven, and the USPO applied the following enhancements: (a) a 18-level increase for loss exceeding $3.5 million, pursuant to § 2B1.1(b)(1)(J); (b) a two-level increase because the offense involved 10 or more victims, pursuant to § 2B1.1(b)(2)(A); and (c) a two-level increase because a substantial part of the fraudulent scheme was committed from outside the United States, pursuant to § 2B1.1(b)(10). Doc. 95 at 15. Following the application of level reductions for acceptance of responsibility, zero-point offender, and minor participant, the resulting total offense level was determined to be 22. *Id.* at 16. With no criminal history points, the resulting Guideline range is 41 to 51 months. *Id.* at 21.

## II. DEFENDANT'S OFFENSE CONDUCT

As set forth in the Factual Basis and the Statement of Relevant Conduct (PSR paragraphs 7-14; 16-59), Defendant participated in a tech support fraud scheme through several different call center entities referred to collectively as "Capstone." Defendant's criminal conspiracy defrauded thousands of individuals across the United States by tricking those victims into paying for unnecessary computer technical support services through the use of "pop ups" and false statements

[2] On January 21, 2026, the parties participated in a pre-sentencing conference with the United States Probation Office pursuant to the Court's Sentencing Guideline Order. Doc. 91.

made by Capstone call center employees on calls with the victims. The pop ups purchased and employed by Capstone appeared on victim computers, locked the victim computers, displayed false messages regarding non-existent computer errors, and instructed the victims to call the number displayed on the pop ups for technical support. Although the pop ups misled victims into believing that the number displayed was for the official Microsoft technical support department, the number instead connected victims to Capstone's India-based call center. Indeed, Capstone used various entity names to create the illusion of an affiliation with Microsoft, such as "MS Infotech" and "MS-Squad."

When victims called into the Capstone call center due to the pop up, Capstone employees then relied on the false statements contained in the pop ups and made further false statements to trick the victims into believing their computers could not be fixed unless they paid hundreds or even thousands of dollars to Capstone (whom victims believed to be Microsoft) to fix the issue. No computer issues in fact existed, and thus Capstone did not provide real technical support. Defendant's role in the scheme was to supervise the payments made by victims to Capstone, including by opening and managing Capstone's payment processing accounts with third party vendors, and handling other payment issues such as victim chargebacks. Without Defendant's payment processing accounts, Capstone would not have been able to receive payments from victims. When Capstone experienced issues with payment processing, Defendant received physical checks from victims mailed to his house in Charlotte, North Carolina.

As set forth in the PSR (paragraphs 7-14; 16-59), the undisputed evidence reflects that Defendant willfully participated in the tech support fraud criminal conspiracy while knowing all aspects of its fraudulent nature, including: (1) Capstone used fraudulent pop ups to generate victim calls; (2) Capstone call center employees lied to victims on the calls to trick them into paying for

the non-existent technical support; (3) Capstone call center employees misrepresented themselves as Microsoft to trick victims; and (4) Capstone did not actually provide any technical support.

## III. LEGAL STANDARD

In determining the appropriate sentence, "a district court must begin by correctly calculating the applicable Guidelines range." *United States v. Evans*, 526 F.3d 155, 160 (4th Cir. 2008) (quotations and citations omitted). The advisory Guidelines are "the starting point and the initial benchmark[.]" *Gall v. United States*, 552 U.S. 38, 39 (2007). The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice . . .. [I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). "[A] Guidelines sentence will usually be reasonable, because it reflects both the Commission's and the sentencing court's judgment as to what is an appropriate sentence for a given offender." *Id.* at 351. Ultimately, however, the appropriate sentence is for the District Court to determine based on the factors enumerated in 18 U.S.C. § 3553(a), and "any sentence, within or outside of the Guidelines range, as a result of a departure or of a variance, must be reviewed by appellate courts for reasonableness pursuant to an abuse of discretion standard." *United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011).

It is well-established that "[s]entencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as th[e] Guidelines sentence is treated as advisory and falls within the statutory maximum . . .." *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008).

## IV. ARGUMENT

### A. The PSR properly calculated the loss amount sentencing enhancement.

The Government must establish the loss amount by a preponderance of the evidence, but the court need only make a "reasonable estimate" of the loss. *United States v. Shephard*, 892 F.3d 666, 673 (4th Cir. 2018) (citations omitted). The United States Sentencing Guidelines set forth that, for calculating loss under 2B1.1, "[l]oss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1)(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1(b)(1)(C)(i). "Reasonably foreseeable pecuniary harm" is defined as "pecuniary harm that defendant knew or, under the circumstances, reasonably should have known, as a potential result of the offense." U.S.S.G. § 2B1.1(b)(1)(C)(iv). The Application Notes of the United States Sentencing Guidelines set forth additional information on how loss should be estimated for the purposes of U.S.S.G. § 2B1.1(b)(1). First, the court need only make a reasonable estimate of the loss. U.S.S.G. § 2B1.1 Note 3(B). Next, the Court is in a unique position to assess the evidence and estimate the loss based upon that evidence. *Id*. For this reason, the Court's loss determination is entitled to appropriate deference. *Id*.

In addition, in a "jointly undertaken criminal activity," the Defendant is responsible for "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Bolden*, 325 F.3d 471, 499 (4th Cir. 2003). Under conspiracy law, Defendant is liable for the conduct of all co-conspirators that was in furtherance of the conspiracy and reasonably foreseeable to him. *United States v. Newsome*, 322 F.3d 328, 338 (4th Cir. 2003); *see Pinkerton v. United States,* 328 U.S.

640, 646–47 (1946). "[T]he evidence need only establish a slight connection between a defendant and the conspiracy" to establish that the defendant was involved in the conspiracy. *United States v. Green,* 599 F.3d 360, 367 (4th Cir.2010), *United States v. Zanders*, 410 F. App'x 700, 702–03 (4th Cir. 2011). Additionally, "one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities over the whole period of its existence." *United States v. Banks,* 10 F.3d 1044, 1054 (4th Cir.1993).

In *United States v. Duncan*, 578 F. App'x 183 (4th Cir. 2014), the Fourth Circuit found the defendant responsible for loss amounts generated by acts performed solely by other individuals in the conspiracy, even those committed by individuals unknown to the defendant. Defendant was held responsible for all losses generated by the conspiracy from the date the defendant joined the conspiracy. *Id*. at 187-90. Uniformity of method and coordination in execution supported the court's inclusion of the loss attributable to others involved in the criminal activity. *Id*. at 187–89 ("Given the structure, nature, and duration of the conspiracy, such losses clearly were within the scope of her agreement and reasonably foreseeable to her.") (*citing United States v. Otuya*, 720 F.3d 183, 191 (4th Cir. 2013).

The PSR calculated a loss amount of over $3,500,000 and imposed an 18-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J) based on the Government's Statement of Relevant Conduct, which sets forth that Capstone received $7,743,592.88 in revenue between June 2014, when Defendant joined the conspiracy, and the end of 2018. PSR ¶¶ 55; 66. Capstone's revenue (*i.e.*, victim losses) during the time period in which the Defendant participated in the criminal conspiracy is clearly within the scope of the criminal activity, in furtherance of the criminal activity, and reasonably foreseeable in connection with the criminal activity. Defendant has not objected to this revenue calculation, nor the end date of the conspiracy. Nonetheless,

Defendant objected to the 18-level enhancement, and claims that the loss reasonably foreseeable to Defendant was less than $3,500,000, resulting in a 16-level enhancement. Doc. 94 at 3.

Given that Defendant does not dispute the Government's calculation of Capstone revenue of over $7 million, the basis for Defendant's objection to a loss amount of over $3,500,000 is somewhat unclear. Defendant may be arguing that although he does not dispute that Capstone caused over $7 million in victim losses, less than $3.5 million of those losses was reasonably foreseeable to Defendant. As established in the PSR, not only was over $3.5 million in victim losses reasonably foreseeable to Defendant, but in fact, the evidence proves that Defendant had <u>direct knowledge</u> of over $3.5 million in victim losses. Defendant himself tracked all victim payments to Capstone. PSR ¶ 56-59. Indeed, Defendant sent monthly emails to his co-conspirators setting forth Capstone's revenue each month. *Id*. The monthly victim loss figures calculated by Defendant in his own emails to co-conspirators total $6,929,601.19. PSR ¶ 56. Moreover, Defendant negotiated to receive as his personal profit three percent of all Capstone revenue and calculated his cut of the victim funds in each monthly email. PSR ¶ 59. Since Defendant knew that he received $222,334 as his three percent cut of Capstone revenue, he would of course know that meant that Capstone's revenue was over $7 million. Since Defendant was indisputably aware that Capstone generated approximately $7 million from the scheme, as he provided that revenue figure to his co-conspirators, that loss amount was of course well beyond reasonably foreseeable to Defendant.

Defendant made several objections to the PSR all relating to his position that, although he joined Capstone in June 2014, he only later became "aware of the conspiracy." Doc. 94 at 1-2. By its very nature, "a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence" of an agreement. *United States v. Burgos,* 94 F.3d 849, 857 (4th Cir. 1996).

Indeed, a conspiracy may be proved wholly by circumstantial evidence. *Id*. at 858. *See United States v. Iannelli,* 420 U.S. 770, 777 n. 10 (1975); *United States v. Laughman,* 618 F.2d 1067, 1074 (4th Cir. 1980). Circumstantial evidence tending to prove a conspiracy may consist of a defendant's "relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy." *United States v. Collazo,* 732 F.2d 1200, 1205 (4th Cir. 1984).

Defendant has not yet identified a date on which he concedes that he became aware of the conspiracy, nor provided any evidence in support of his claim in his objections, but in any event, the PSR sets forth undisputed facts that prove that he knowingly joined the criminal conspiracy in June 2014 and that the victim losses from that time forward were reasonably foreseeable to him. By way of example, in June 2014, Defendant received an onboarding email from a co-conspirator that instructed Defendant to lie to payment processors by falsely representing in payment processing applications that Capstone: (1) was wholly owned by Defendant, not his co-conspirators; and (2) was in the business of website design, and not a technical support call center—both statements Defendant knew to be false. PSR ¶¶ 23-24, 50-51. As early as June 25, 2014, Defendant did make such misrepresentations to payment processors to conceal the true ownership and nature of Capstone in order to facilitate victim payments to Capstone. PSR ¶ 23. Defendant even submitted fake invoices for real victims to payment processors in order to conceal the tech support fraud scheme by changing an invoice from technical support to that of web design. PSR ¶ 26. It should go without saying that a legitimate business would not need to make fraudulent representations to engage with payment processing companies. Based on the evidence, the Government requests that the Court make an individualized finding that Defendant joined the conspiracy in June 2014. *See United States v. Glover*, 715 Fed. App'x 253, 257-58 (4th Cir. 2017)

(finding the date at which defendant joined fraud conspiracy for sentencing loss calculation based on evidence that supported "inference" as to start date); *United States v. Adetona*, 251 Fed. App'x 610, 615-16 (4th Cir. 2007) (where "defendant presents no evidence to contradict the reasonable inference from the government's evidence on amount of loss, the district court does not err by relying on the evidence presented by the government"). Thus, Defendant knowingly joined the criminal conspiracy as early as June 2014 and is responsible for victim losses from June 2014 onward: over $7 million.

A co-conspirator's statement to Defendant on August 13, 2014, that Capstone was not committing fraud is unavailing to Defendant's argument and, rather, supports the Government's position. PSR ¶ 25. First, the mere fact that Defendant felt compelled to ask his co-conspirator regarding Capstone's fraudulent activities reflects Defendant's knowledge that he had joined a criminal conspiracy, as individuals employed by legitimate businesses do not need to ask their partners whether the businesses were committing fraud. Second, in the same exchange between Defendant and his co-conspirator, Defendant instructs the co-conspirator to keep Capstone a secret, stating "u need to keep that on the down low." *Id*. A legitimate non-fraudulent business does not, of course, need to be kept a secret. Finally, in the same exchange, the co-conspirator stated that Defendant knew about all aspects of the scheme, stating "[y]ou know everything what we are dealing with." *Id.* What's more, six days later, Defendant boasted about his misstatements in service of Capstone, stating to a co-conspirator, "nigga I bs [bullshit] financial stuff for Wells Fargo [his then-day job] I can do it for you haha." PSR ¶ 25. Several months later, in November 2014, Defendant sent another message to his co-conspirator that proves that Defendant knew Capstone was committing fraud, stating that the co-conspirator's uncle told Defendant that Capstone was fraudulent. PSR¶ 26. Defendant's response wasn't to withdraw from the

conspiracy, but rather to, as he put it, "play[] dumb." *Id*.

Even if Defendant was able to prove that he did not knowingly join the conspiracy in June 2014, the undisputed evidence reflects Defendant's knowledge of the fraudulent nature of the conspiracy by at least as late as April 2016. *See, e.g.,* PSR ¶¶ 29-36 (October 2014 through April 2016); ¶ 45 (February 2016); ¶ 52 (February 2016). Multiple chargeback letters directed to Defendant beginning in October 2014 contained victim statements describing how they were defrauded by Capstone. PSR ¶¶ 29-33. The same occurred in August 2015 (PSR paragraph 34), January 2016 (PSR paragraph 35), and February 2016 (PSR paragraphs 45 and 52). These victim statements received by Defendant in no uncertain terms informed Defendant that Capstone was a scam that used fraudulent pop ups and didn't provide any real technical support, and that Capstone was misrepresenting itself as Microsoft. For example, on January 20, 2016, Defendant received a chargeback letter from a Capstone victim that stated that Capstone had "represented themselves as Microsoft and did not fix the computer." PSR ¶ 35. Defendant photographed this chargeback letter and texted the photo to his co-conspirator. On February 3, 2016, Defendant received a victim chargeback letter to reverse a $249.99 charge that contained a Capstone customer complaint which stated that the customer's "computer was frozen with a pop up and would not let her get out of the pop up" unless the victim contacted Capstone, and that Capstone charged her for services that she did not want. PSR ¶ 45. Defendant again photographed this chargeback letter and texted the photo to his co-conspirator. In yet another example, Defendant received a letter from the North Carolina Department of Justice, Consumer Protection Division on April 13, 2016, which informed him that a Capstone victim filed a fraud claim detailing that the victim experienced a pop up, and that the pop up directed the victim to call Capstone, who had misrepresented themselves in the pop up and over the phone as being Microsoft. PSR ¶ 36. Banwari, yet again, took a photograph of this letter

and texted it to a co-conspirator. Defendant did not cease his participation in the criminal conspiracy until the FBI executed a search warrant on his residence in August 2018 regarding the scheme. The fact that Defendant's receipt of victim complaint after victim complaint—including a warning letter from the North Carolina state law enforcement authorities—did not cause him to withdraw from the conspiracy proves that Defendant was already well aware of the fraudulent nature of the conspiracy before he received the complaints.

Of the over $7 million received by the conspirators from victims as a result of the scheme, over $3.5 million was received after April 2016. Specifically, bank records reflect $1,784,233.24 in Capstone revenue from April 2016 through December 2016; $1,561,833.63 in Capstone revenue for 2017 and 2018; and Defendant's own emails reflect $399,274.94 in revenue for the United Technologies Capstone entity from July 2016 through January 2018, totaling $3,745,34.81 in victim funds generated from April 2016 onwards. Thus, even if Defendant did not knowingly join the conspiracy as early as June 2014, which he did, he was undoubtedly a knowing participant in the conspiracy by at least as late as April 2016, and the relevant loss amount attributable to Defendant is still over $3,500,000, and an 18-level enhancement should still be applied.

**B. Application of the 18 U.S.C. § 3553(a) sentencing factors**

The Court must consider the § 3553(a) factors in fashioning a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing. The Court must also avoid unwarranted sentencing disparities.

The nature and circumstances of the offense and the need for the sentencing to reflect the seriousness of the offense and to promote respect for the law support a significant sentence. This was a sophisticated multi-year conspiracy that involved careful planning and significant infrastructure for the criminal enterprise, including employing pop ups, operating an India-based

call center with many employees, opening numerous bank accounts, creating numerous corporate entities, opening dozens of payment processing accounts, and generating millions of dollars of victim losses. The Defendant victimized thousands of individuals and caused significant harm to those individuals by both rendering their computers inoperable and defrauding them into paying significant sums for computer issues that were created by Capstone. Defendant was no doubt aware that the victims of this scheme were, in large part, the elderly, warning his co-conspirator that family members of "poor old ladies" might recognize their "scams." PSR ¶¶ 52-53.

Regarding the history and characteristics of the Defendant, there appears to be no financial, familial, or substance abuse related causes for Defendant's criminal conduct other than greed. At the time of Defendant's participation in the criminal conspiracy, Defendant had a business degree from Appalachian State University and a well-paid job at a bank. He also appeared to have significant family support. Based on his educational and employment background, Defendant was not deceived into joining the fraud scheme by his co-conspirators. Indeed, Defendant was more educated than his co-conspirators and had lived in the United States for far longer than they. He had studied and worked in finance at the same time he was deceiving banks and payment processors in service of Capstone. Defendant joined the conspiracy knowingly and voluntarily because he found it so lucrative and repeatedly pushed his co-conspirators to generate more revenue. Ultimately, Defendant received $222,334 as his share of the victim losses. What's particularly troubling about Defendant's criminal conduct is how much pleasure he appeared to take in scamming victims. Defendant often joked with his co-conspirators that they were "scamming" people and that the FBI would be coming for them. PSR ¶ 43. On February 22, 2017, Defendant told a co-conspirator, "[t]ech support should be easy. Just scam ppl [people]. No real service." PSR ¶ 41. On May 23, 2017, referred to a Capstone victim as "stupid" because he or

she called Capstone based on a Capstone pop up. PSR ¶ 49.

General deterrence is critically important in this case. Complex international cybercrimes are some of the most technically difficult to identify and investigate. The difficulty of identifying these schemes significantly complicates law enforcement efforts to identify the perpetrators of these schemes, especially when they are located abroad, as here. The use of foreign call centers to scam victims in the United States is so omnipresent that many unfortunately likely accept that scam calls are a facet of modern American life. The individuals who perpetrate scam calls need to be deterred from doing so by the prospect of significant terms of imprisonment based on the harm that they cause.

For the reasons above and the 3553(a) factors, the Government respectfully submits that the Defendant cannot meet his burden to support a downward variance or departure from the applicable Guideline range, and thus a Guideline sentence of 41 months of imprisonment is sufficient but not greater than necessary to achieve the sentencing factors set forth in 18 U.S.C. § 3553(a).

## V. <u>RESTITUTION</u>

The Mandatory Victims Restitution Act provides that "the court shall order . . . that the defendant make restitution to the victim of the offense" upon conviction for "an offense against property . . . including any offense committed by fraud or deceit." 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). Pursuant to 18 U.S.C. § 3663A and U.S.S.G. § 5E1.1, the Court must order restitution in this case. As part of the investigation, investigators identified a number victims of Defendant and Capstone. PSR ¶ 109. The Court should therefore order restitution as to these victims as set forth in the PSR. *Id.* On July 9, 2025, the Court ordered the United States to

implement certain alternative victim notification procedures. Doc. 92. These efforts have not resulted in the identification of additional victims.

Restitution to identifiable wire fraud victims is mandatory unless the Court finds that either "the number of identifiable victims is so large as to make restitution impracticable; or [] determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3); *see also* U.S.S.G. § 5E1.1(b)(2). Both prongs apply in this case with respect to the unidentified victims. The sentencing process will be unduly burdened by the fashioning of an order of restitution regarding unidentified victims because of the complexity involved in ascertaining victims' identities and losses. The Government could not identify victims *en masse* based on financial or phone records. As a result, the victim associated with any particular Capstone payment cannot be determined without individualized legal process directed at each transaction. Manually identifying, proving, and notifying thousands of victims (or more) in order to meet the United States' burden of proof as to the losses sustained by the as yet-unidentified victims pursuant to 18 U.S.C. § 3664(e) would be unduly burdensome and would unduly burden the sentencing process. While there are thousands of victims of Defendant's fraud that have not been identified, the nature of the fraud scheme and the evidence available to the Government makes further identification efforts impracticable. Thus, the Government requests that the Court order restitution as to the identified victims and make a finding that although the Court recognizes that there are thousands more of unidentified victims, that further restitution regarding the unidentified victims is impracticable.

## VI. FORFEITURE AND FINE

The United States is seeking an order of forfeiture in the amount of $222,334, which represents Defendant's personal gain from the fraud scheme. PSR ¶ 59.

The Court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a). The fine range for this offense is from $15,000 to $150,000. PSR ¶ 107.

## VII. CONCLUSION

For the foregoing reasons, the United States respectfully submits that a sentence at the low end of the applicable Guideline range, or 41 months, is sufficient but not greater than necessary to serve the purposes of sentencing outlined in 18 U.S.C. § 3553(a).

Respectfully submitted, this 3rd day of February, 2026.

DALLAS J.E. KAPLAN
FIRST ASSISTANT UNITED STATES ATTORNEY
*Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515*

*s/ Matthew Warren*
Matthew Warren
Assistant United States Attorney
United States Attorney's Office
Western District of North Carolina
227 West Trade Street Suite 1700
Charlotte, North Carolina 28202
Telephone: 704.344.6222
E-mail: matthew.warren@usdoj.gov

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 3rd day of February, 2026.

DALLAS J.E. KAPLAN
FIRST ASSISTANT UNITED STATES ATTORNEY
*Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515*

*s/ Matthew Warren*
Matthew Warren
Assistant United States Attorney
United States Attorney's Office
Western District of North Carolina
227 West Trade Street Suite 1700
Charlotte, North Carolina 28202
Telephone: 704.344.6222
E-mail: matthew.warren@usdoj.gov